

**WILMINGTON**
RODNEY SQUARE

**NEW YORK**
ROCKEFELLER CENTER

**Anne Shea Gaza**
P 302.571.6727
agaza@ycst.com

<u>**VIA CM/ECF & HAND DELIVERY**</u>   October 24, 2023

The Honorable Colm F. Connolly
U.S. District Court for the
 District of Delaware
844 N. King Street
Wilmington, DE 19801

Re:   *Synopsys, Inc. v. Bell Semiconductor, LLC*, C.A. No. 22-1512-CFC

Dear Chief Judge Connolly:

Pursuant to D.I. 304, Plaintiff Synopsys, Inc. ("Synopsys") submits this letter responding to the Court's questions in connection with Plaintiff's Motion for Partial Summary Judgment No. 1 of No Pre-Counterclaim Damages (D.I. 190).

**Question 1:   <u>What is the patented invention?</u>**

The six asserted patents generally relate to specific methods used in the process of designing semiconductor chips. The asserted patents note that these methods can be, and typically are, "performed by a … software tool." (D.I. 213, Ex. 29 (259 patent) at 1:32-33; D.I. 216, Ex. 31 (803 patent) at 1:33-34; *see also* D.I. 216, Ex. 41 (626 patent) at 5:55-56; D.I. 213, Ex. 26 (989 patent) at 6:46-49; D.I. 216, Ex. 34 (760 patent) at 5:51-53.) Software instructions that implement the claimed inventions "may be embodied in a disk, a CD-ROM, and other computer readable media…." (D.I. 216, Ex. 41 (626 patent) at 5:55-59.) Each patent is specifically described below.

**259 patent:**   The 259 patent describes a specific algorithm (which can be implemented in software or performed by hand) for determining where to insert "dummy metal" (*i.e.*, electrically nonfunctioning metal shapes that are added to a design in order to facilitate later manufacture of the design) into the chip design. (D.I. 213, Ex. 29 (259 patent) at 1:31-40, 2:19-23; D.I. 173 at 2.) This specific algorithm inserts all dummy fill with only a single run of the dummy fill tool by prioritizing the order in which to add dummy fill to different regions of the design and inserting dummy fill next to clock nets last. (D.I. 213, Ex. 29 (259 patent) at 2:19-35.)

In particular, the 259 patent claims "computer readable medium containing program instructions" and methods to "insert[] dummy metal into a circuit design" in a specific manner. (D.I. 213, Ex. 29 (259 patent) at 6:25-10:13.) The claims, as construed by the *Bell Semiconductor*

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
October 24, 2023
Page 2

*v. NXP* court, require among other things: (1) "creating a list of dummy regions on each layer of the circuit design, obtained from subtracting the outline of circuit objects from tile(s) on which the circuit objects lie, without hard coding a large stay-away distance between dummy metal and clock nets" and (2) "ordering the list of dummy regions such that dummy regions next to/adjoining clock nets are filled last, without hard coding a large stay-away distance between dummy metal and clock nets, where the fill is inserted in a single run." (D.I. 216, Ex. 33 at 15, 23; D.I. 213, Ex. 29 (259 patent) at claims 1, 18, 35.)

**803 patent:** The 803 patent describes a specific process for performing dummy metal insertion (adding electrically nonfunctioning metal shapes) in a chip design that avoids having to rerun the dummy fill software tool after the design is changed. (D.I. 216, Ex. 31 (803 patent) at 1:8-10; D.I. 173 at 2.) When a design is changed, the design changes can put design objects in locations that were already occupied by dummy metal (that had been inserted into the design before the change was made). (D.I. 216, Ex. 31 (803 patent) at 1:51-69.) Rather than re-do the dummy metal insertion after a design change to ensure that no dummy metal intersects with any of the design changes, the 803 patent checks for any such intersections between the design changes and the existing dummy metal and deletes any intersecting dummy metal. (*Id.* at 2:6-14, 1:53-59.)

In particular, the 803 patent claims "computer readable medium containing program instructions" and methods to, among other things: (1) after a chip design that has already had dummy metal added to it is changed, "check to determine whether any [of the previously inserted] dummy metal objects intersect with any other objects in the design data"; and (2) delete all "intersecting dummy metal objects from the design data." (D.I. 216, Ex. 31 (803 patent) at 5:59-6:10.) This avoids the need to remove dummy metal from the design after a design change and rerun the dummy fill tool in order to re-do the dummy metal insertion. (*Id.* at 1:51-59, 6:9-10.)

**989 patent:** The 989 patent describes a specific process for verifying that a chip design meets only a subset of all criteria it must eventually meet in order for the design to be manufactured. (D.I. 213, Ex. 26 (989 patent) at 1:18-23, 2:28-31, 2:38-40, 3:20-25, 5:46-51.) The criteria used to verify a design are contained in a text file known as a "rule deck." (*Id.* at 4:15-21, 3:35-37; 5:41-51.) The 989 patent checks only a subset of the criteria for manufacturability by creating a new rule deck file (called a "specific rule deck") that includes only those design rules from the standard rule deck that are needed to detect one or more specific issues—such as texted metal shorts—and omitting other design rules. (*Id.* at 4:15-21; 4:65-5:45.) This specific rule deck file is then used with existing commercial verification software tools to check only the specific issues that are included in the specific rule deck. (*Id.* at 5:41-51.)

In particular, the 989 patent claims "computer program product[s]" and methods to perform limited physical design validation using a generated specific rule deck. (D.I. 213, Ex. 26 (989 patent) at 8:1-47.) The claims, as construed by the *Bell Semiconductor v. NXP* court, require among other things: (1) "creating a separate rule deck from the physical design rule deck by reducing down the physical rule deck" (D.I. 216, Ex. 33 at 44; D.I. 1, Ex. F (989 patent) at 7:15-20, 8:11-15); and (2) "performing a physical design validation" on a chip design using "the specific rule deck to identify texted metal short circuits." (D.I. 1, Ex. F (989 patent) at 7:21-25, 8:16-20.)

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
October 24, 2023
Page 3

**626 patent:** The 626 patent describes a specific process for implementing a change to a design. (D.I. 216, Ex. 41 (626 patent) at Abstract.) After changes are made to a design, the connections between the different circuit elements (referred to as "nets") need to be redone (referred to as "incremental routing") in order to accommodate the change. (*Id.* at 3:57-4:9, 2:53-65.) The 626 patent creates a "window" around the design change and only incrementally routes the portion of the design contained within the window. (*Id.* at 3:57-4:9.)

In particular, the 626 patent claims "computer readable storage medium tangibly embodying instructions for a computer" and methods to implement an engineering change order using a window. (D.I. 216, Ex. 41 (626 patent) at 7:16-8:24.) The claims, as construed by the Court, require among other things: (1) creating at least one window (*i.e.*, "a rectilinear boundary that encloses an area of the integrated circuit design that is less than the entire area of the integrated circuit design") (D.I. 173 at 2; D.I. 216, Ex. 41 (626 patent) at 6:59-64, 7:24-8:3); and (2) "performing an incremental routing" of all nets enclosed by the window. (D.I. 216, Ex. 41 (626 patent) at 6:65-67, 8:4-6.)

**760 patent:** The 760 patent describes a specific method for identifying overlapping dummy fill shapes on successive layers and rearranging the dummy fill shapes to minimize any overlap in dummy fill shapes on successive layers. (D.I. 216, Ex. 34 (760 patent) at 2:24-34.)

In particular, the 760 patent claims methods "for placing dummy fill patterns" in a specific manner. (D.I. 216, Ex. 34 (760 patent) at claims 1, 14.) The claims, as construed by the *Bell Semiconductor v. NXP* court, require among other things: "moving a plurality of first dummy fill features and/or a plurality of second dummy fill features from an initial arrangement to a new arrangement" to minimize the overlap between the dummy fill shapes on one layer with those on a second layer. (D.I. 216, Ex. 33 at 36; D.I. 216, Ex. 34 (760 patent) at claims 1, 14.)

**807 patent:** The 807 patent describes a specific method that determines the width of dummy fill shapes based on a "deposition bias." (D.I. 216, Ex. 35 (807 patent) at 6:16-25.) The deposition bias is determined by measuring protrusions in the different, manufactured layers of a semiconductor device. (D.I. 216, Ex. 33 at 40 (defining "deposition bias" as "a positive or negative value [that is] based on the width of the protrusion in the dielectric material as compared to the width of the underlying active interconnect feature.")

In particular, the 807 patent claims specific methods for inserting dummy fill shapes into a design. (D.I. 216, Ex. 35 (807 patent) at claim 1.) The claims, as construed by the *Bell Semiconductor v. NXP* court, require among other things: (1) defining the minimum width of dummy fill shapes "based on the width of the protrusion in the dielectric material as compared to the width of the underlying active interconnect feature" (D.I. 216, Ex. 33 at 40); and (2) adding sufficient dummy fill shapes to the design in order to meet the desired density of metal (both dummy fill shapes and interconnects) in each region of the design. (D.I. 216, Ex. 35 (807 patent) at claim 1.)

**Question 2:** **Is the patented invention software?**

The claims of the asserted patents do not all necessarily require software, but all accused products and products allegedly embodying the asserted patents are software.

Of the six asserted patents, four include claims drawn to "computer readable medium containing program instructions" (259 patent, claim 18; 803 patent, claim 12), "computer program product" (989 patent, claim 7) or "computer readable storage medium tangibly embodying instructions for a computer" (626 patent, claim 5). Media containing program instructions and computer program products are software. The remaining two patents (760 and 807 patents) include only general method claims that do not reference software, program instructions or computer program products. (807 patent, claims 1 and 9; 760 patent, claims 1 and 14.)

All accused products are software. (D.I. 207, Ex. 14.) Additionally, all unmarked products Synopsys identified as embodying the asserted claims of the 259, 803, 989 and 626 patents are software. (D.I. 191, ¶¶ 1, 4-6; D.I. 264, ¶¶ 3-4.)

**Question 3:** **Who has the burden to establish that a claimed invention is capable of being marked?**

Bell Semiconductor LLC ("Bell") has the burden of proving that products embodying the asserted patents were not capable of being marked because Bell has the burden of proving compliance with the statutory notice requirements.

As the Federal Circuit has confirmed, the "burden of proving compliance with marking is and **at all times remains on the patentee**." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1367 (Fed. Cir. 2017) (emphasis added). In connection with marking, the crux of the issue is not whether the claimed invention was capable of being marked, but whether patent-practicing products were capable of being marked in order to provide constructive notice of the patent. *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996) ("When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement.").

A patentee who contends that a product is incapable of being marked retains the burden "to identify a fact issue with respect to any limitation, physical or otherwise" that would prevent the product or its packaging from being marked. *Belden Techs. Inc. v. Superior Essex Commc'ns LP*, 733 F. Supp. 2d 517, 536 (D. Del. 2010) (granting summary judgment of no pre-suit damages for patentee's failure to raise factual issues with respect to the markability of patent-practicing products.); *Contour IP Holding, LLC v. GoPro, Inc.*, No. 17-4738-WHO, 2020 WL 5106845, at *7 (N.D. Cal. Aug. 31, 2020) (granting summary judgment of no pre-suit damages because "[patentee] point[ed] to no evidence suggesting that marking the camera itself was not possible"

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
October 24, 2023
Page 5

and merely argued "it would have been impossible or impractical to mark."); *see also Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, 397 F. Supp. 3d 560, 578 (D. Del. 2019) (granting summary judgment of no pre-suit damages because patentee failed to demonstrate why its website could not comply with the virtual marking requirements of § 287).

A party challenging compliance with § 287 only "bears an initial burden of production to articulate the products it believes are unmarked 'patented articles.'" *Arctic Cat*, 876 F.3d at 1368. In this case, Synopsys met its burden of production with a letter dated June 1, 2023 identifying products from several licensees, including Siemens' Aprisa and Calibre software products which, according to Bell's own allegations, practice the claims of the 626, 803, 989 and 259 patents. (*See* D.I. 191, ¶¶ 1-6.) Courts recognize that "software can be marked in various ways, such as in the electronic transfer message or as a page in the program." *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-284-LPS, 2018 WL 7893901, at *4. Because Synopsys met its initial burden of production to articulate the products it believes are unmarked patented articles, Bell "bears the burden to prove the products identified do not practice the patented invention," *Arctic Cat*, 876 F.3d at 1368, or are otherwise incapable of being marked. *Belden Techs.*, 733 F. Supp. 2d at 536.

Should Your Honor have any questions or concerns regarding the foregoing, counsel are available at the Court's convenience.

Respectfully submitted,

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)

cc:   All Counsel of Record (via email)